**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JACOB JAMES CHAVEZ,**<br><br>Plaintiff,<br><br>*v.*<br><br>**UNITED PARCEL SERVICE, INC.,**<br><br>Defendant. | **CIVIL ACTION**<br><br>**NO. 25-2479-KSM** |

# MEMORANDUM

**Marston, J.** **September 30, 2026**

It is not the Court's job to question the propriety of employee termination decisions absent discriminatory animus. But that is exactly what pro se Plaintiff Jacob James Chavez asks the Court to do. Plaintiff brings claims against his former employer, Defendant United Parcel Service, Inc., ("UPS") for age discrimination, race discrimination, hostile work environment, harassment, disability discrimination and retaliation. Presently before the Court is UPS's motion for summary judgment as to all of Plaintiff's claims (Doc. No. 26), which Plaintiff opposes. (Doc. No. 32, 33). For the reasons below, UPS's motion is granted.

## I. FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Plaintiff, the relevant facts are as follows.

### A. Plaintiff's Employment at UPS

Plaintiff was hired by UPS as a seasonal driver in 2014. (Doc. No. 27 at ¶ 1; Doc. No. 33 at ¶ 1.) In January 2016, Plaintiff was promoted to Package Car Driver ("Driver"). (*Id.* at ¶ 2.) As a Driver, Plaintiff was required to comply with the directives of his manager, follow his

computer-generated route assignment, and schedule and deliver packages consistent with his route. (Doc. No. 27 at ¶ 7; Doc. No. 33 at ¶ 7.) UPS maintains a GPS system called Telematics which allows facility managers to track Drivers along their delivery routes. (Doc. No. 27 at ¶ 8; Doc. No. 33 at ¶ 8.) Telematics shows a Driver's location, speed, if the vehicle is running, its movement, and engine status. (Doc. No. 27 at ¶ 9; Doc. No. 33 at ¶ 9; Doc. No. 34 at ¶ 5.) Drivers are expected to stick "to trace" meaning that they are expected to drive along the computer-generated routes as closely as they can, deliver packages in the order directed, and, if a driver needs to detour from the prescribed route, they are expected to inform UPS. (Doc. No. 27 at ¶ 10–11; Doc. No. 33 at ¶ 10–11.)

Plaintiff was also required to comply with UPS' policies and procedures, including three policies that are relevant to this action. First, UPS maintains an "Honesty in Employment Policy," which provides that dishonesty or theft "WILL result in immediate dismissal and possible criminal prosecution." (Doc. No. 27 at ¶¶ 12–13; Doc. No. 33 at ¶¶ 12–13 (emphasis in original).) Second, UPS also maintains a "Professional Conduct and Anti-Harassment Policy" which prohibits discrimination or harassment of any kind, including disability-based harassment. (Doc. No. 27 at ¶ 17; Doc. No. 33 at ¶ 17.) That policy provides that "UPS will not tolerate harassment of any employee by anyone for any reason." (Doc. No. 27 at ¶ 18; Doc. No. 33 at ¶ 18.) Finally, UPS maintains a Help Line, where employees can file anonymous complaints of discrimination and harassment. (*Id.* at ¶ 19; Doc. No. 33 at ¶ 19.)

During his time at UPS, Plaintiff was a member of the International Brotherhood of Teamsters ("IBT"), so his employment was also governed by a collective bargaining agreement between UPS and IBT (the "CBA"). (Doc. No. 27 at ¶ 3; Doc. No. 33 at ¶ 3.) Participation in IBT allowed Plaintiff to grieve alleged violations of the CBA, including issues related to

discipline and termination. (Doc. No. 27 at ¶¶ 4, 6; *see* Doc. No. 27 at ¶ 5 (defining a "grievance" as "any controversy, complaint, misunderstanding, or dispute arising as to the interpretations, application, or observance of any provisions of this Agreement or Supplements hereto").) During the course of Plaintiff's employment at UPS, he filed several grievances and UPS Help Line complaints. (Doc. No. 27 at ¶ 31; Doc. No. 33 at ¶ 31.)

### B. Plaintiff's Injury History

#### *1. Plaintiff's Shoulder Injuries*

In February 2021, Plaintiff sustained a shoulder injury that required surgery and a temporary lifting restriction. Plaintiff was released back to work for full duty in February 2022. (Doc. No. 27 at ¶ 20; Doc. No. 33 at ¶ 20.) Shortly thereafter, Plaintiff reinjured his shoulder in late 2022 and underwent another surgery. (Doc. No. 27 at ¶ 20; Doc. No. 33 at ¶ 20.) After again returning to work for full duty in February 2023, Plaintiff reinjured his shoulder for a third time and was off work from August 2023 to November 2023. (Doc. No. 27 at ¶ 22; Doc. No. 33 at ¶ 22.) After returning to work for full duty in November 2023, Plaintiff had no further restrictions with respect to his shoulder. (Doc. No. 27 at ¶ 23; Doc. No. 33 at ¶ 23.) However, less than a year later, in May 2024, Plaintiff began experiencing episodes of dizziness and heart palpitations.

#### *2. Plaintiff's Dizziness and Heart Palpitations*

On May 16, 2024, Plaintiff experienced his first episode of dizziness and heart palpitations while on duty. (Doc. No. 27 at ¶ 24; Doc. No 33 at ¶ 24.) Then, on May 20, 2024, Plaintiff experienced these symptoms again while driving and reported them to UPS. (Doc. No. 27 at ¶ 25; Doc. No. 33 at ¶ 25.) UPS relieved Plaintiff of his driving duties for the remainder of his shift on May 20, 2024, and requested that he be cleared by a physician before driving again.

(Doc. No. 34 at ¶ 9.) The next day, Plaintiff filed an internal Ethics Hotline[1] complaint concerning his medical condition and management's response following his health episode. (Doc. No. 34 at ¶ 12.) Neither this complaint nor previous grievances he filed alleged that he suffered from any disability. (Doc. No. 27 at ¶ 31; Doc. No. 32 at ¶ 31.)

That same day, Plaintiff saw a medical provider. (*Id.* at ¶ 10.) His medical provider issued him a note excusing him from work for the remainder of the day and stating that "[Plaintiff] can return to work at the UPS HUB and return to driving June 5, 2024." (Doc. No. 27 at ¶ 27; Doc. No. 33 at ¶27; Doc. No. 34 at 11.) Plaintiff submitted the note to Business Manager Jessica Monreal. (Doc. No. 27 at ¶ 27; Doc. No. 34 at 11.) Monreal sent Plaintiff text messages instructing him to apply for short-term disability benefits.[2] (Doc. No. 34 at ¶ 13.)

On June 6, 2024, Plaintiff returned to his Driver position without any restrictions after passing UPS' Driver Fitness Determination Exam. (Doc. No. 27 at ¶ 28; Doc. No. 33 at ¶ 28.) Plaintiff stated during his deposition that he could "fully perform [his] job at all times [he was] employed by UPS." (Chavez Dep. Tr. at 141:1–14; Doc. No. 27 at ¶ 30, Doc. No. 33 at ¶ 30.)

### C. Plaintiff's Termination

Drivers are responsible for accurately recording their time, including indications of their meal and break times. (Doc. No. 27 at ¶ 32; Doc. No. 33 at ¶ 32.) According to the CBA, UPS "shall have the right to require employees to take a meal period of one (1) hour" per day. (Doc. No. 27-5 at 21; Doc. No. 33 at ¶ 33; Doc. No. 27 at ¶ 33.) Drivers can take their paid breaks in

---

[1] Plaintiff references the "Ethics Hotline" in his additional statement of undisputed facts, but the Court presumes this refers to the UPS Help Line referenced in Defendant's statement of undisputed facts.

[2] Plaintiff began the short-term disability claims process and informed management, including Division Manager Frederick Carr, that he had a follow-up medical appointment scheduled for June 24, 2024. (Doc. No. 34 at ¶¶ 14–15.) But before he completed the short-term disability claims process, Plaintiff was terminated on June 25, 2024. (*Id.* at ¶¶ 14, 20.)

as few or as many breaks throughout the day as desired, so long as they only take one paid hour in total and accurately code all time utilized. (Doc. No. 27 at ¶ 34.) Failure to accurately code meal and break times is considered time theft by UPS and is an immediately terminable offense consistent with UPS' Honesty in Employment Policy and the CBA. (Doc. No. 27 at ¶ 35; Doc. No. 33 at ¶ 35.)

In June 2024, Human Resources informed Plaintiff's immediate supervisor, On-Road Supervisor Timothy Drake, that Plaintiff had reported not being compensated for a route-related efficiency bonus.[3] (Doc. No. 27 at ¶ 37; Doc. No. 33 at ¶ 37.) Drake asked Monreal to investigate, and she reviewed Plaintiff's Telematics and payroll reports to determine whether he had earned an efficiency bonus as claimed. (Doc. No. 27 at ¶ 37; Doc. No. 33 at ¶ 37.) When reviewing Plaintiff's Telematics and payroll reports, Monreal determined that Plaintiff was deviating from his assigned route, taking unauthorized extended lunch breaks at either a riverbank or his home, and inaccurately recording his meal breaks. (Doc. No. 27 at ¶ 38; *but see* Doc. No. 33 at ¶ 38 ("Plaintiff denies taking 'unauthorized extended lunch breaks,' denies inaccurate recording with intent to defraud, and disputes that Telematics and payroll summaries alone establish those conclusions.").)

Monreal's Report stated the following: Plaintiff reported having taken thirty minute lunches each day, but his Telematics showed the following: (i) on June 10, 2024, Plaintiff parked his truck at the river for sixty-five minutes; (ii) on June 11, 2024, Plaintiff parked his truck at the river for sixty-three minutes; (iii) on June 12, 2024, Plaintiff parked his truck at the river for fifty-eight minutes; and (iv) on June 14, 2024, Plaintiff parked his truck at the river for ninety

[3] The efficiency bonus is given to employees who complete their route faster than expected based on the Company's internal estimates of how long deliveries should take. (Doc. No. 27 at ¶ 36; Doc. No. 33 at ¶ 36.)

minutes. (Doc. No. 27 at ¶ 40; Doc. No. 33 at ¶ 40.)[4] The following week's Telematics showed similar discrepancies for Plaintiff, including that he drove to and from his home each day, adding an average of twenty-six minutes and eight-and-a-half miles to his planned day. (Doc. No. 27 at ¶ 44; Doc. No. 33 at ¶ 44.) The data also showed that Plaintiff took a two-hour lunch on June 19, 2024, which was recorded as a thirty-minute break. (Doc. No. 27 at ¶ 42; Doc. No. 33 at ¶ 42.)[5]

Based on these findings, Monreal reported to her supervisor, Division Manager Carr, that she believed Plaintiff was inaccurately recording his time, being dishonest, and stealing time. (Doc. No. 27 at ¶¶ 45–46; Doc. No. 33 at ¶¶ 45–46.) Carr then met with Plaintiff to discuss the inconsistences between his reported time-worked and the Telematics reports. (Doc. No. 27 at ¶ 47; Doc. No. 33 at ¶ 47.) During the meeting, Plaintiff admitted that he took his lunch breaks

---

[4] Plaintiff disputes that Telematics stationary time equals non-work activity or establishes intent, and disputes that Defendant has established undisputed facts as to what was recorded, by whom, and under what coding procedures. However, Plaintiff has put forth no evidence to refute the accuracy of his Telematics data. (Doc. Nos. 33, 34.)

[5] Plaintiff does not dispute the time entry as recorded (*see* Chavez Dep. Tr. 217:15 ("they should be correct")), but argues that "management entered or adjusted time codes" (*see* Doc. No. 33 at ¶ 39). However, he does not point to any affirmative evidence to suggest that management enters or adjusts time codes. *See Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604 (D.N.J. 2023) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.").

And, after the close of discovery, Plaintiff moved to compel production of electronically stored information, including "DIAD communications and timekeeping audit data reflecting how *Plaintiff's work time and meal periods were recorded and controlled*." (Doc. No. 25 (emphasis added).) After a status call with the parties, the Court denied this motion as moot. However, the Court wrote that even "[i]f the court were to consider Plaintiff's out of timing filing, it would be denied. During the Court's telephone conference on February 10, 2026, Defendant stated that the documentation related to Plaintiff's motion to compel was destroyed pursuant to the company's automatic retention system policy. Defendant previously notified Plaintiff of this policy during his unemployment hearing, as well as, in Defendant's responses to Plaintiff's discovery requests in the instant case." (Doc. No. 29.) And yet again, after Defendant filed its motion for summary judgment, Defendant filed a Declaration Pursuant to Fed. R. Civ. P. 56(d) (*see* Doc. No. 31) asking the Court to deny Defendant's motion for summary judgment, or, in the alternative "permit limited production" of what he deems "missing materials" including payroll calculations audit trails, metadata, and raw exports. These are all categories of data that UPS previously represented to the Court do not exist.

either by the river or at his house. (Doc. No. 37 at ¶ 48; Doc. No. 33 at ¶ 48.) Because the data showed Plaintiff's truck not moving for hours at a time despite Plaintiff allegedly only taking a thirty-minute meal break, Carr began to ask Plaintiff to reconcile the specific Telematic data from the two weeks Monreal reviewed. (Doc. No. 27 at ¶ 50; Doc. No. 33 at ¶ 50.) Plaintiff had no explanation for the discrepancies. (Doc. No. 27 at ¶ 51; Doc. No. 33 at ¶ 51.) Given the Telematics data and Plaintiff's inability to explain, Carr concluded that Plaintiff was being dishonest and terminated his employment on June 25, 2024. (Doc. No. 27 at ¶ 52; Doc. No. 33 at ¶ 52.)

Plaintiff subsequently grieved his termination. (Doc. No. 27 at ¶ 53; Doc. No. 33 at ¶ 53; Doc. No. 27-5 ("The Union filed a grievance for my discharge.").) As part of the grievance process, the IBT presented Plaintiff's case to a panel consisting of an equal number of UPS and IBT decision-makers. After a ninety-minute presentation, including testimony from Plaintiff, the joint panel voted to uphold Plaintiff's termination. (Doc. No. 27 at ¶¶ 55–56; Doc. No. 33 at ¶¶ 55–56; *see also* Doc. No. 27-7 at 6.)

### D. Plaintiff's Unemployment

Following his termination, Plaintiff filed for unemployment compensation, which was granted. (Doc. No. 32.) As part of that process, a hearing was conducted before an unemployment referee, and both Plaintiff and UPS appeared and testified. (Doc. No. 32 at 17; Doc. No. 34 at ¶ 2.) The referee's summary of the hearing stated his view that: (1) UPS presented no corroborating documentary evidence establishing that Plaintiff was discharged for "willful misconduct"; and (2) Plaintiff's testimony was more credible.[6] (Doc. No. 34 at ¶ 1.)

[6] The Court notes, however, that Plaintiff's unemployment compensation proceedings are "immaterial" and the outcome of the unemployment compensation hearing is "impertinent" to the issues of this case. *Miller v. HF Lenz Company*, No. 22cv00142, 2023 WL 4746539, at *9 (W.D. Pa. July 25, 2023). "The standards by which an unemployment compensation case is decided are different than the

UPS did not appeal the referee's decision to grant Plaintiff benefits under Section 402(e) of the Pennsylvania Unemployment Compensation Law. (*Id.* at ¶ 2; Doc. No. 32 at 17 ¶ 6.)

### E. Plaintiff's Charges of Discrimination

On October 2, 2024, Plaintiff filed a separate charge against UPS with the National Labor Relations Board ("NLRB") alleging that UPS terminated him for engaging in union and/or protected activities. (Doc. No. 27 at ¶ 60; Doc. No. 33 at ¶ 60; Doc. No. 27-5 at 119.) After an investigation, the NLRB found that the "evidence fail[ed] to establish [that UPS] took adverse action against [Chavez] because of any union and/or protected activity . . . ." (*Id.* at ¶¶ 61, 62 (finding that the "evidence did not establish that [UPS'] decision [to terminate] was based on any alleged union or protected activities, rather than legitimate business reasons").

On February 18, 2025, Plaintiff also dual-filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"). (Doc. No. 27 at ¶ 57; Doc. No. 33 at ¶ 57.) In his Charge, Plaintiff alleged that UPS discriminated and retaliated against him based on his disability in violation of the Americans with Disabilities Act ("ADA"). (Doc. No. 27 at ¶ 58; Doc. No. 33 at

---

issues presented in an employment discrimination case." *Id.*; *Williams v. Temple Univ. Hosp., Inc.*, 345 F. Supp. 3d 590, 595 (E.D. Pa. 2018) ("[A]s of 2003, the Pennsylvania Unemployment Compensation law was amended to state: "[n]o finding of fact or law, judgment, conclusion or final order made with respect to a claim for unemployment compensation under this act may be deemed to be conclusive or binding in any separate or subsequent action or proceeding in another forum." 43 Pa. Stat. and Cons. Stat. Ann. § 829 [hereinafter "Section 829"]. Under 28 U.S.C. § 1738, because Pennsylvania courts do not give preclusive effect to decisions made with respect to a claim for unemployment compensation, there is no legal basis upon which a federal court can do so.")

And while Defendant did not move in limine to exclude evidence of Plaintiff's unemployment compensation hearing, courts have excluded evidence about unemployment compensation proceedings via motion in limine before ruling on a motion for summary judgment. *See Tukesbrey v. Midwest Transit, Inc.*, 822 F. Supp. 1192, 1197 (W.D. Pa. 1993) ("[D]efendant's motion *in limine* to exclude evidence regarding the unemployment compensation proceeding will be granted because the referee's decision is not relevant under Fed. R. Evid. 401 and 402."); *see also Evans v. Cernics, Inc.*, No. 14cv125, 2017 WL 4863207, at *3 (W.D. Pa. Oct. 26, 2017). As such, the Court does not find the outcome or analysis of Plaintiff's unemployment compensation hearing relevant to the instant motion for summary judgment.

¶ 58.) The parties agree that the Charge does not allege that UPS discriminated or retaliated against Plaintiff based on his age or race, that UPS created a hostile work environment, or that anyone at UPS harassed Plaintiff. (Doc. No. 27 at ¶ 59; Doc. No. 33 at ¶ 59 ("Admitted")). On March 10, 2025, the EEOC issued Plaintiff a Right to Sue letter. (*See* Doc. No. 2-1 at 1–5.)

## II. PROCEDURAL HISTORY

Plaintiff filed his pro se Complaint on May 14, 2025. (Doc. No. 2.) The parties agree that Plaintiff's Complaint asserts the following claims against UPS: (1) wrongful termination under the ADA, 42 U.S.C. §§ 12112–17, based on his purported disability[7]; (2) wrongful termination under the PHRA, 43 Pa. Const. Stat. §§ 951–63, based on his race, age, and purported disability, and (3) retaliation under the ADA on the basis of his purported disability, race, age, and prior grievance filings. (*See* Doc. Nos. 27 at ¶ 63; 33 at ¶ 60; Doc. No. 2-1 at 7; Chavez Dep. Tr. 60:3-4 ("I felt that I was wrongfully terminated, harassed, and discriminated against."); *see also* Doc. No. 2-1 ("I allege that I have been discriminated and retaliated against on the basis of my disability").) UPS filed an Answer to Plaintiff's Complaint on September 8, 2025. (Doc. No. 20.) Following the close of discovery, UPS moved for summary judgment on all of Plaintiff's claims. (Doc. No. 26.) Plaintiff opposes this motion, and UPS has filed a reply in response to his opposition. (Doc. Nos. 32, 35.)

## III. LEGAL STANDARD

Summary judgment is appropriate when the "materials in the record" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[7] Neither Plaintiff nor Defendant's statements of undisputed facts specify clearly what disability Plaintiff's claims are predicated on. But because Plaintiff's Complaint discusses both his shoulder surgery (*see* Doc. No. 2 at 7 ("I was temporarily disabled for nearly ten months")) and heart palpitations (*see* Doc. No. 2 at 7 ("It began with me seeing blurry, feeling dizzy and then began feeling what I would call heart palpitations")), the Court addresses both of Plaintiff's alleged disabilities in the discussion section of this memorandum.

law." Fed. R. Civ. P. 56(a), (c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage[,] the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (internal quotations omitted); *see also Matsushita Elec. Indus. Co.*., 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (internal quotations omitted). "[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal quotations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## IV. DISCUSSION

Defendant argues that summary judgment is appropriate because: (1) Plaintiff has failed to exhaust his administrative remedies for his PHRA age, race, hostile work environment and/or harassment claims; (2) Plaintiff's ADA claim for wrongful termination fails as a matter of law; and (3) Plaintiff's ADA retaliation claim fails as a matter of law.[8] We agree; and we address each argument in turn.

### A. Plaintiff Did Not Exhaust His Administrative Remedies

[8] Because the same legal standards apply to the ADA and PHRA, the Court considers Plaintiff's ADA and PHRA claims together. *See, e.g.*, *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("[W]e will only discuss [the plaintiff's] ADA claim because our analysis of an ADA claim applies equally to a PHRA claim."); *Boice v. Se. Pa. Transp. Auth.*, No. 05cv4772, 2007 WL 2916188, at *12 n.20 (E.D. Pa. Oct. 5, 2007).

"It is well established that, as a prerequisite to filing an employment discrimination suit under . . . the ADA[ ] or the PHRA, a plaintiff must first exhaust his administrative remedies." *Lomidze v. Chester Downs & Marina, LLC*, No. 14cv1279, 2015 WL 1759205, *2 (E.D. Pa. Apr. 16, 2015) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976). Under the ADA, a plaintiff must exhaust his remedies before the EEOC prior to filing a complaint in federal court.[9] *Itiowe v. NBC Universal Inc.*, 556 F. App'x 126, 128 (3d Cir. 2014); *Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999). The exhaustion mechanism requires filing a charge with the EEOC within 300 days of the alleged unlawful employment practice. *Williams v. East Orange Cmty. Charter Sch.*, 396 Fed. App'x. 895, 897 (3d Cir. 2010); *see* 42 U.S.C. § 2000e-5. If a plaintiff receives a right to sue letter from the EEOC following the filing of a charge, the plaintiff may proceed to court with their allegations to the extent that the claims are within the scope of the initial administrative charge. *Williams*, 396 F. App'x. at 897. The "parameters of the civil action in the district court are defined by the scope of the EEOC investigation which [could] reasonably be expected to grow out of the charge of discrimination." *Lomidze,* 2015 WL 1759205, at *3 (citing *Ostapowicz*, 541 F.2d at 398–99). A claim is reasonably expected to grow out of an EEOC charge when "there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." *Reynolds v. Aria*

---

[9] Similarly, to file an action under the PHRA, plaintiff must first file a complaint with the Pennsylvania Human Relations Commission ("PHRC") within 180 days of the alleged act of discrimination. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013). "Failure to exhaust one's remedies under the PHRA precludes a court from exercising jurisdiction over the party's claim under the PHRA in subsequent litigation." *Parsons v. City of Phila. Coordinating*, 833 F. Supp. 1108, 1112 (E.D. Pa. 1993). However, a plaintiff can also comply with exhaustion requirements through the PHRA if the EEOC transmits a filed complaint to the PHRC for further processing. *Id.*; *see e.g.*, *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996) (explaining that the purpose of the exhaustion requirement is to put the agencies and the parties on notice therefore "afford[ing] the EEOC the opportunity to settle [the] dispute[] through conference, conciliation, and persuasion, avoiding unnecessary action in court").

*Health*, No. 12cv2954, 2013 WL 2392903, at *4 (E.D. Pa. May 31, 2013) (quoting *Pourkay v. City of Philadelphia*, No. 06cv5539, 2009 WL 1795814, at *5 (E.D. Pa. June 23, 2009)). "In such a case, the Court may reasonably expect an awareness on the part of the defendant that such allegations are likely." *Schouten*, 58 F. Supp. 2d at 616–17.

Here, Plaintiff attempted to exhaust administrative remedies for all of his claims by dual filing a charge with the EEOC and PHRC on February 18, 2025. (Doc. No. 26-1 at 13; *see also* Doc. No. 27-5 at 140–43.) Defendant argues that Plaintiff's charge did not allege that UPS discriminated or retaliated against him based on his race or age, that UPS created a hostile work environment, or that anyone at UPS harassed him.[10] (Doc. No. 27 at ¶ 59; ; *see also* Chavez Dep. Tr. at 84:3-85:19 ("[I]t did not make its way into the [EEOC] charge; fair? A: That is correct.").) Plaintiff does not dispute that his age, race, hostile work environment, and harassment claims remain unexhausted and does not raise any of these claims in his opposition to Defendant's motion for summary judgment.[11] (Doc. No. 32.) As such, the Court finds that Plaintiff has failed to exhaust his administrative remedies with respect to his age, race, hostile

---

[10] Although the parties agree that Plaintiff did not include harassment in his charge, the Court's own review of Plaintiff's charge finds that he did discuss harassment and check the box for a harassment claim. (*See* Doc. No. 2 at 6–11.) However, the Court will "not disturb the undisputed fact" agreed-upon by the parties, especially where, as here, Plaintiff has abandoned any harassment claim by failing to mention it in his opposition brief. *West v. Northampton Clinic Co., LLC*, No. 17cv02101, 2018 WL 4145897, at *8 (E.D. Pa. Aug. 30, 2018), *aff'd*, 783 F. App'x 118 (3d Cir. 2019); *See infra* n.8

[11] In the alternative, the Court finds that Plaintiff has abandoned his age, race, hostile work environment, and harassment claims by failing to address the exhaustion argument in his opposition. Indeed, by failing to respond, Plaintiff has failed to carry his burden of showing there is a genuine issue of material fact as to whether he properly exhausted these claims with the EEOC. *See e.g.*, *Skirpan v. Pinnacle Health Hosp.*, No. 07cv1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) ("Where a plaintiff has brought a cause of action which is challenged through [sic] motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion. Indeed, a plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues.").)

work environment and harassment claims, and summary judgment is appropriate as to these claims.[12] (Doc. No. 26-1 at 14.)

### B. Plaintiff's ADA Claims

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(a)). Plaintiff asserts two claims under the ADA: (1) that he was wrongfully terminated at UPS because of his disability; (2) that he was retaliated against because of his disability. (Doc. No. 27 at ¶ 63; Chavez Dep. Tr. at 81:9–13 ("[T]he only things that you are alleging according to this is that you were discriminated and retaliated against based on your disability, right? A: Yes.").) The Court finds Defendant has carried its burden at summary judgment on both claims, and addresses each in turn.

#### *1. Wrongful Termination*

To prevail on his wrongful termination claim, Plaintiff "must first make out a prima facie case of disability discrimination." *Barclay v. Amtrak*, 435 F. Supp. 2d 438, 443 (E.D. Pa. 2006). To state a prima facie case of disability discrimination under the ADA, Plaintiff must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor*, 184 F.3d at 306 (cleaned up).

[12] Defendant does not dispute that Plaintiff properly exhausted his claims for disability discrimination and retaliation under the ADA and PHRA. Plaintiff included narrative detail as to these claims in his EEOC charge and received a right to sue letter on March 10, 2025. (*See* Doc. No. 2-1 at 1–5.)

The *McDonnell Douglas* burden shifting framework applies where, as here, a plaintiff does not have direct evidence of discrimination. Under the *McDonnell Douglas* test, after a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the employee. *See, e.g.*, *Cunningham v. Novo Nordisk,* No. 12cv6654, 2014 WL 1318390, at *4 (E.D. Pa. Apr. 1, 2014); *Barclay*, 435 F. Supp. 3d at 445. If the employer succeeds, the burden then shifts back to the employee to show that the stated reasons were false and merely pretextual. *Barclay*, 435 F. Supp. 3d at 445.

With this framework in mind, Defendant argues that Plaintiff's wrongful termination claim must be dismissed because: (1) Plaintiff was not disabled, and his purported disability was not a determinative factor in UPS' termination decision; (2) UPS had a legitimate, nondiscriminatory reason for terminating his employment; and (3) no evidence supports that Plaintiff's termination was pretext for discrimination. (Doc. No. 26-1 at 14.)

i. <u>Prima Facie Case</u>

The Court first considers whether Plaintiff has made out a prima facie case of disability discrimination, based on his termination from UPS on June 25, 2024. For this inquiry, we look at whether (1) Plaintiff had a disability at the time he was terminated, and, if so, (2) whether he was terminated "*because of his disability*." *Campo v. Mid-Atl. Packaging Specialties, LLC,* 564 F. Supp. 3d 362, 380 (E.D. Pa. 2021) (emphasis in original).

As to the first prong, a person is disabled within the meaning of the ADA if he (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1).[13] In his opposition, Plaintiff claims that he is disabled

[13] Defendant mistakenly quotes this section of the ADA's disability definition as an "and" provision rather than an "or" provision and therefore focus solely on Plaintiff's failure to demonstrate the

under the third prong — the "'regarded as' theory." (Doc. No. 32 at 4.)

A person is "regarded as" having a disability if he (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the employer as constituting such limitation; (2) has a physical or mental limitation that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) has no such impairment but is treated by an employer as having a substantially limited impairment. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir.1999) (quoting 29 C.F.R. § 1630.2(1)). In simple terms, when an employer "misinterpret[s] information about an employee's limitations to conclude that the employee is incapable of performing a wide range of jobs," that employee is "regarded as" disabled under the ADA. *Id.*

Here, Plaintiff avers that "[m]edical records reflect shoulder surgeries in 2021 and 2022, subsequent re-injury in 2023, and documented work restrictions including lifting limitations." (Doc. No. 32 at 4.) He concludes that "[t]hese records demonstrate a physical impairment and, viewed in the light most favorable to Plaintiff, support an inference that UPS was aware of Plaintiff's condition." (*Id.*) Contrary to Plaintiff's assertion, "the mere fact that an employer is *aware* of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled or that that perception caused the adverse employment actions." *Howell*, 959 F. Supp. at 269 (citations omitted). And despite Plaintiff's argument that he had previous work restrictions with regard to his shoulder injuries, Plaintiff admitted that after he returned to work in November 2023, he had no further restrictions with respect to his shoulder. (Doc. No. 27 at ¶ 23; Doc. No. 33 at 23). Plaintiff explicitly states in his deposition that he could "fully

first prong of the definition. (*See* Doc. No. 26-1 at ¶¶ 15–18); *see* 42 U.S.C. § 12102(1). However, because Plaintiff asserts that his "ADA claim proceeds under a 'regarded as' theory" the Court only addresses his claim under this prong.

perform [his] job at all times [he was] employed at UPS."[14] (Doc. No. 27 at ¶ 30; Chavez Dep. Tr. 99:1-4 ("[S]o as of November of 2023 you did not have any work restrictions; is that correct? A: That is correct."); *Id*. at 98:19–25, 99:2–3 ("[W]ere you fully cleared from your physician to return? A: Yes. . .[I was designated as] MRI, um, RI, reach maximum improve. . . something like that?. . .Is it maximum medical improvement? A: It's something like that.")). As such, the Court does not find that Plaintiff was "regarded as" disabled due to his previous shoulder injuries.

However, as to Plaintiff's episodes of dizziness and heart palpitations in May 2024, the record does show that UPS "regarded" Plaintiff as disabled. On both May 16, 2024, and May 20, 2024, Plaintiff experienced dizziness and heart palpitations that required him to stop working. (Doc. No. 27 at ¶ 25; Doc. No. 33 at ¶ 25.) On the second occasion, UPS relieved Plaintiff of his duties for the remainder of his shift that day and requested that he be cleared by a physician before driving again. (Doc. No. 27 at ¶ 26; Doc. No. 33 at ¶ 26.) *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 514 (3d Cir. 2001) (citing 42 U.S.C. § 12102(1)). Plaintiff's supervisor also directed Plaintiff to file for short term disability. (Doc. No. 32 at 20.) The Court finds that as of May 21, 2024, Plaintiff's supervisor viewed Plaintiff's dizziness and heart palpitations as a "substantially limiting impairment" qualifying as a disability.[15] *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002).

But that does not end the inquiry. Even if Plaintiff was regarded as being disabled as of May 21, 2024, there is no evidence that Plaintiff was terminated "because of his disability." To

---

[14] The Court recognizes that Plaintiff was unable to do his job when had shoulder surgery, but as of November 2023, the record demonstrates that he had recovered with no further restrictions and was fully able to perform his job as it relates to his shoulder. (Doc. No. 27 at ¶ 23; Doc. No. 33 at 23).

[15] On June 6, 2024, Plaintiff passed UPS' Drive Fitness Determination Exam and was cleared to drive without any restrictions. (Doc. No. 27 at ¶ 28; Doc. No. 33 at ¶ 28.) However, this does not change the fact that Plaintiff's supervisor viewed his dizziness and heart palpitations a "substantially limiting impairment" between May 21 to June 6.

meet this standard, Plaintiff must show that his heart palpitations and dizziness were a "determinative factor" in UPS's decision to terminate him. *See Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 439 (E.D. Pa. 2015) (holding that the plaintiff failed to establish a prima facie case of disability discrimination where "[t]he record contained no evidence that [the defendant] imposed adverse employment actions on Plaintiff because she had a torn meniscus, let alone that Plaintiff's injury was the 'determinative factor' in the decisions to impose such employment actions"). Here, Plaintiff argues that "[a] reasonable jury could conclude that . . . [he was] subjected [] to heightened scrutiny culminating in termination [due to his disability]." (Doc. No. 32 at 4.) But Plaintiff points to no evidence, beyond allegations alone, "that [his] disability was connected to, let alone a 'determinative factor' in, the decision to [terminate him]." *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 237 (3d Cir. 2016); *see also Moore v. CVS Rx Servs., Inc.*, 142 F. Supp. 3d 321, 346 (M.D. Pa. 2015) ("ADA plaintiffs must prove that they were treated differently based on . . . their disability. This requires a showing that the disability played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." (cleaned up)); *Garrow v. Wells Fargo Bank, N.A.*, No. 15cv1468, 2016 WL 5870858, at *9 (E.D. Pa. Oct. 7, 2016) (granting summary judgment to the employer and holding that the plaintiff failed to state a prima facie case of disability discrimination because she "provided no evidence that her disability was a determining factor in her termination" and "[i]nstead, the record [was] rife with evidence that [the plaintiff] was terminated for reasons that were wholly nondiscriminatory"). As such, Plaintiff cannot make out a prima facie case of disability discrimination.

But even assuming arguendo that Plaintiff could make out a prima facie case of disability discrimination, summary judgment is still appropriate on Plaintiff's wrongful termination claim

under the remaining two prongs of the *McDonnel Douglas* test. The Court addresses each in turn below.

ii. Legitimate, Nondiscriminatory Reason

First, the record supports UPS' contention that it has articulated a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff—dishonesty. (*See* Doc. No. 27 at ¶¶ 12–16, 35, 50–52); *see also Anderson v. UPS,* No. 13cv135, 2015 WL 1245843, at *55 (W.D. Pa. Mar. 18, 2015) (UPS satisfied its burden of articulating a legitimate, nondiscriminatory reason for firing Plaintiff by claiming that she was discharged for dishonesty).

UPS' Honesty in Employment Policy states that dishonesty is a terminable offense, and for union employees like Plaintiff, a cardinal offense, for which progressive discipline is not required:

> The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least (1) warning notice of a complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, **except that no warning notice need to be given to an employee before discharge if cause of such discharge is dishonesty** . . .

(See Doc. No. 27 at ¶ 12) (emphasis added.) The Policy also states that dishonesty "WILL result in immediate dismissal . . . ." (Doc. No. 27 at ¶ 13.)

Here, the undisputed facts show that after Plaintiff inquired about his efficiency bonus, Monreal reviewed his Telematics and payroll reports. (Doc. No. 27 at ¶¶ 36–37; Doc. No. 33 at ¶¶ 36–37.) Instead of finding evidence to support the issuance of a bonus, Monreal determined that Plaintiff was deviating from his assigned route, taking unauthorized extended lunch breaks at either a riverbank or his home, and inaccurately recording his meal breaks.[16] (Doc. No. 27 at ¶

[16] As discussed previously, Plaintiff reported having taken thirty minute lunches each day, but his Telematics showed the following: (i) on June 10, 2024, Plaintiff parked his truck at the river for sixty-five

38; Doc. No. 27-6 at 4 ("Monreal Decl.") ("Chavez did not code any of his extended lunch breaks or route deviations on any of the dates included in my report and was paid for all the time he spent on his unreported, extended lunches and deviating from his route as if he were actively performing his job duties. . . . Based on my personal observations and review of the data gathered during my June 2024 investigation, I honestly and in good faith believed that Chavez was inaccurately recording his time, being dishonest, and stealing time.").) Following Monreal's investigation, she shared her findings with her supervisor, Carr, who called Plaintiff into a meeting to discuss the inconsistencies. (Doc. No. 27-6 at 4.) During this meeting, Plaintiff was asked to reconcile the specific Telematic data from the two weeks that were reviewed, and he was "unable to provide an explanation for the lengthy periods of time he claimed he was working." (*Id.* at 5.) Based on the Telematics data and the interview, "Carr concluded that Chavez was being dishonest and terminated his employment on June 25, 2024." (*Id.*) Thus, Defendants have carried their "relatively light" burden of showing that Plaintiff's termination was for legitimate, non-discriminatory reasons. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *Fuentes*, 32 F.3d at 764; *see also McDonnell Douglas Corp.*, 411 U.S. at 802.

iii. Pretext

As to pretext, Plaintiff has failed to present sufficient evidence to raise a genuine dispute as to whether UPS terminated his employment based on his dishonesty or whether that was merely a pretext for disability discrimination. "To show pretext, a plaintiff must 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory

---

minutes; (ii) on June 11, 2024, Plaintiff parked his truck at the river for sixty-three minutes; (iii) on June 12, 2024, Plaintiff parked his truck at the river for fifty-eight minutes; and (iv) on June 14, 2024, Plaintiff parked his truck at the river for ninety minutes. (Doc. No. 27 at ¶ 40.)

reason was more likely than not a motivating or determinative cause of the employer's action.'" *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 91 (3d Cir. 2020) (quoting *Fuentes v, Perkasie,* 32 F.3d 759, 764 (3d Cir. 1994)). "To meet that burden, a plaintiff cannot 'simply show that the employer's decision was wrong or mistaken.' The fact that an employer made a poor or unwise decision does not make that decision discriminatory." *Ball v. Einstein Community Health Assocs., Inc.*, 514 F. App'x 196, 199 (3d Cir. 2013) (citations omitted); *Perry-Hartman v. Prudential Ins. Co. of Am*., No 17cv4732, 2021 WL 3077551, at *7 (E.D. Pa. July 20, 2021) (same). "Evidence undermining an employer's proffered legitimate reasons therefore must be sufficient to support an inference that the employer did not act for its stated reasons." *Ball*, 514 F. App'x at 199–200 (cleaned up); *Perry-Hartman*, 2021 WL 3077551, at *7 ("Thus, a plaintiff survives summary judgment by proffering admissible evidence that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." (cleaned up)). A non-moving party can satisfy that burden by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Ball*, 514 F. App'x at 199–200 (cleaned up).

Here, Plaintiff makes a few arguments seeking to establish pretext—none of which hold water. First, Plaintiff contends that "Defendant's motion depends on establishing that Plaintiff acted with intentional dishonesty," which he asserts they cannot prove based on Telematics alone.[17] (Doc. No. 32 at 2.) However, whether Plaintiff had the *intent* to deceive UPS regarding

[17] Plaintiff also asserts that "[a]bsent time-entry audit logs and medatada, a reasonable jury could conclude the discrepancies resulted from coding practices rather than intentional falsification." (Doc. No. 32 at 2.) However, Plaintiff has not put forth any affirmative evidence to dispute the accuracy of UPS' Telematics data.

his lunch breaks is not a material fact. To the contrary, it is "irrelevant to our analysis here, which is focused [solely] on whether [UPS] had inconsistent reasons for terminating [Plaintiff]. It did not." *Campo*, 564 F. Supp. 3d at 386. Defendant maintains that Plaintiff was terminated following an investigation that determined, using Telematics data[18], that he was taking longer breaks than recorded. (Doc. No. 26-1 at 22.) And when questioned about these breaks, he "had no explanation for this discrepancy." (*Id.*) Plaintiff has not refuted Defendant's stated reason for termination, and "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Kautz v. Met-Pro Corp*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765). Plaintiff also has not put forward any evidence to dispute the accuracy of Telematics and that anyone but him entered the time. (*See* Doc. No. 33.) *Schaar v. Lehigh Valley Health Servs*., Inc., 732 F.Supp. 2d 490, 493 (E.D. Pa. 2010) ("[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment).

Plaintiff also seeks to manufacture a dispute of material fact by arguing that Defendant has not produced several documents including, for example, payroll calculation sheets and time-entry edit histories identifying who entered or modified meal periods. (Doc. No. 32 at 3.) He argues that "without [these documents], the Court cannot determine as a matter of law that (1) an overpayment occurred, (2) the calculation was accurate, or (3) Plaintiff acted with intent to

[18] Plaintiff also asserts that his termination was improper because the CBA "provides that data shall not by itself be considered dishonesty and required corroboration beyond telematics before discharge." (Doc. No. 32 at 2.) However, as the record establishes, Plaintiff was only terminated after an interview where he "was unable to provide an explanation for the lengthy periods of time where he claimed he was working, but Telematics showed his truck was at the riverbank or his home and not moving." (Doc. No. 27 at ¶ 51.) Plaintiff's assertion that Telematics alone does not constitute grounds for terminating him does not create a genuine dispute suggesting pretext.

defraud." (Doc. No. 32 at 3-4.) However, at this stage, "[d]iscovery has closed and Plaintiff cannot defeat summary judgment based on unsupported speculation or assumptions that additional evidence exists." *See Parker v. Sch. Dist. of Phila.*, 823 F. App'x 68, 72 (3d Cir. 2020) ("[A] litigant cannot rely on . . . speculation [or] . . . unsupported assumptions . . . to create a genuine dispute of material fact[.]"). "If Plaintiff had an issue during the course of discovery, he should have raised it with the Court at that time." *Nadie v. United States*, No. 25cv3064, 2026 WL 1303431, at *7 n.10 (E.D. Pa. May 12, 2026).

For these reasons, the Court finds that Plaintiff fails to establish pretext. Defendant is entitled to summary judgment as to Plaintiff's wrongful termination claim pursuant to the ADA.

### *2. Retaliation Claim*

Next, the Court turns to Plaintiff's retaliation claim. While difficult to discern, the Court construes Plaintiff's retaliation claim as asserting that UPS wrongfully terminated his employment because he requested accommodations and filed grievances. (Doc. No. 27 at ¶¶ 12, 63.) Defendant argues that Plaintiff's retaliation claim must be dismissed because: (1) Plaintiff did not engage in protected employee activity; (2) Plaintiff cannot demonstrate that his termination was causally related to statutorily protected expression; and (3) Plaintiff's termination was legitimate and non-pretextual. (Doc. No. 26-1 at 20–26.)

The same *McDonnell Douglas* burden shifting framework discussed above applies to Plaintiff's retaliation claim.

#### i. <u>Prima Facie Case</u>

To make out a prima facie case of retaliation, Plaintiff must show that (1) he engaged in a protected activity; (2) he "was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity"; and (3) "there is a causal connection between the

protected activity and the adverse action." *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 446–47 (E.D. Pa. 2014) (cleaned up), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). Defendant challenges the first and third elements.

First, Defendant asserts that Plaintiff did not engage in protected employee activity. The Court disagrees. Plaintiff's text messages with Monreal reveal that on May 21, he stated "I was cleared to work by Dr. as per Dr's note provided to you . . . I will now be requesting Reasonable Accommodations [sic]." (Doc. No. 32 at 21.) In a text message that same day, Monreal replied: "You must follow the process to get granted an accommodation. Step 1 is to file for disability." (*Id.*) It is well established that "[r]equesting an accommodation is a protected employee activity under the ADA." *Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 702 (E.D. Pa. 2015) (citing *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003); *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010)). Unlike disability discrimination claims, ADA and PHRA retaliation claims do not require the plaintiff to establish that they are actually disabled. *See Shellenberger*, 318 F.3d at 191. Rather, the plaintiff only needs to establish they made a good faith request for an accommodation. *See id.* at 191 (stating "[t]he right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC . . . . [T]o prosecute an ADA retaliation claim for requesting reasonable accommodations, a plaintiff need not show that she suffers from an actual disability" (citations and internal quotations omitted)). Plaintiff also filed an internal Ethics Hotline complaint concerning his medical episode and management's response following his health episode. (Doc. No. 34 at ¶ 12.) Thus, Plaintiff engaged in protected activity.

Second, Defendant argues that Plaintiff cannot demonstrate that his termination was causally related to his protected conduct. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Oden v. SEPTA*, 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (citation omitted). The Court agrees with Defendant that neither factor is present here to establish a causal link.

***Temporal Proximity.*** As to temporal proximity, Plaintiff argues that the timeline between the chain of events leading to his termination is "compressed." (Doc. No. 32 at 4 (pointing the Court to when he "was removed from driving on May 20, returned to work on June 6 after clearance, contacted Human Resources on June 20 regarding compensation concerns, and the audit began that day. . . [and he] was terminated five days later, on June 25. 2024")). Although on its face, the approximate one-month time period between Plaintiff's May 21 commencement of the accommodation process and his termination on June 25 could be seen as unduly suggestive—the Third Circuit directs that the district court to look at the "entire record before us" to determine whether the causation element is met. *Weiler v. R&T Mech., Inc.*, 255 F. App'x 665, 668 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 284 (3d Cir. 2000)). Here, a "crucial intervening factor" breaks the causal chain between Plaintiff's start of the accommodation process on May 21 and his termination. *Weiler*, 255 F. App'x at 668. Specifically, Plaintiff's *own inquiry* on June 20 regarding his compensation concerns, which in turn triggered Monreal's investigation into his Telematics data. *Weiler*, 255 F. App'x at 669. The investigation into Plaintiff's Telematics data constitutes "an intervening event" sufficient to break the timeline. *Checa v. Drexel Univ.*, No. 16cv108, 2016 WL 3548517, at *6 (E.D. Pa.

June 28, 2016) ("A causal link between an employee's protected activity and an adverse employment action can be broken by an intervening event.") (citing *Weiler*, 255 F. App'x at 669).

***Pattern of Antagonism.*** Plaintiff has also failed to show "a pattern of antagonism" from Defendant leading to his termination. *Bartos v. MHM Corr. Servs., Inc.*, 454 F. Appx 74, 79 (3d Cir. 2011) (quoting *Robinson v. Se. Pa. Transp. Auth.,* 982 F.2d 892, 895 (3d Cir. 1993)). To establish a "pattern of antagonism" Plaintiff would need to show a "consistent and continuous" pattern of conduct such as a "constant barrage of written and verbal warnings" as well as "disciplinary action." *Bartos v. MHM Corr. Servs., Inc.,* 454 F. App'x 74, 79 (3d Cir. 2011) (quoting *Robinson v. Se. Pa. Transp. Auth.,* 982 F.2d 892, 895 (3d Cir. 1993)). Plaintiff fails to offer evidence showing "a pattern of antagonism" connecting his accommodation request to his termination. As such, he cannot establish a prima facie case of retaliation.

ii.. Legitimate, Nonretaliatory Reasons and Pretext

And, even if Plaintiff had established a prima facia case of retaliation, for the reasons discussed *supra* with respect to his ADA wrongful termination claim, the Court concludes that UPS has met its burden of articulating a legitimate, nonretaliatory reason for terminating Plaintiff—his dishonesty. Plaintiff does not offer any additional pretextual arguments beyond those the Court already discussed with regard to his wrongful termination claim. As such, the Court grants summary judgment as to Plaintiff's retaliation claim.[19]

## V. Conclusion

[19] Defendant's motion for summary judgment also states that "[i]t is unclear from Plaintiff's pro se Complaint whether he asserts a cause of action for punitive damages." (Doc. No. 26-1 at 27 n.9.) Because the Court grants Defendant's motion for summary judgment in its entirety, there is no need to address any potential claim for punitive damages.

For the foregoing reasons, the Court grants Defendant's motion for summary judgment. An appropriate Order follows.